Filed 6/11/24  In re Owen S. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re OWEN S., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>D.S.,<br><br>    Defendant and Appellant. | G063618<br><br>(Super. Ct. No. 23DP1077)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Daphane Grace Sykes, Judge.  Affirmed in part and reversed in part with instructions.

Marisa L. D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Debbie Torez and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*          \*          \*

The purpose of juvenile dependency proceedings is to protect "children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm*." (Welf. & Inst. Code, § 300.2, subd. (a), italics added.)[1] A juvenile court need not wait until a child is seriously abused or injured to assume jurisdiction. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193–196.)

Here, the Orange County Social Services Agency (the Agency) filed a dependency petition alleging four-month-old Owen S. was at a substantial risk of serious physical harm by Daniel S. (Father). (§ 300, subd. (a).) The allegations were based on Father's prior incidents of having physically abused and inflicted serious physical injuries on two of Owen's half siblings of a similar age about 13 years earlier, and Father's present day failure to acknowledge his past behavior.

The Orange County Juvenile Court (the court) conducted a combined jurisdiction and disposition hearing. As far as its jurisdiction finding, the court sustained the petition and declared Owen a dependent. As far as its dispositional orders, the court left Owen in the custody of Michelle S. (Mother), and ordered supervised visitation for Father, along with other services. Father has filed the instant appeal.

Father argues the court's jurisdiction finding was not supported by substantial evidence. We disagree. The severity of the injuries to Owen's half siblings combined with Father's present day failure to acknowledge his actions constitute substantial evidence that supports the court's finding that Father presented a current and substantial risk of serious physical harm to Owen. (See *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge"].)

Father also argues the court's dispositional orders were not supported by

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

substantial evidence and there were reasonable means of protecting the child without removing Owen from Father's custody. County counsel concedes the court failed to state facts supporting its dispositional orders (as it is required to do), but argues Father forfeited this claim by failing to object on these grounds below. We agree. However, we find this an appropriate case to excuse Father's forfeiture.

Consequently, we affirm the court's jurisdiction finding, reverse the court's dispositional orders, and remand with instructions to conduct a new disposition hearing.

I

FACTS AND PROCEDURAL BACKGROUND

In 2015, the Court of Appeal affirmed Father's convictions in San Bernardino County for two counts of child abuse likely to cause injury or death. (Pen. Code, § 273a, subd. (a).) The jury also found true an allegation Father had personally inflicted great bodily injury upon a child under the age of five. (Pen. Code, § 12022.7, subd. (d).) The trial court imposed a prison sentence of eight years. Father's former wife Brittany was also convicted of both crimes and was granted probation.

The Court of Appeal's unpublished opinion was entered into evidence at the jurisdiction/disposition hearing.[2] We quote from the opinion at length because Father's prior abuse of Owen's stepsiblings formed the basis of the Agency's allegations in the instant proceeding (in the opinion Father is referred to as Daniel):

"Daniel and Brittany were married and lived on the Army base in Fort Irwin, California. Brittany's son, G.H., was born in October 2008, and had a different father who was not Daniel. In June 2010, Brittany gave birth to a daughter, N.S.

"While Daniel worked, Brittany managed the household. Defendants

---

[2] We are omitting the case citation for privacy reasons. Also included in evidence were summaries of the related juvenile dependency proceedings in San Bernardino County.

became friends with Heidi R[.] and Keith R[.], who had six children, and Heidi often babysat for G.H. and N.S. G.H. was always hungry when he visited the R[.] family.

"Once when the families were together, Heidi watched Daniel become very upset with G.H., grab his arm and order him to stand against a wall. Heidi confronted Daniel, who admitted he was struggling to control his temper. Heidi also noticed a large hole in the wall at defendants' home.

"During the families' visit to a swimming pool in July 2010, Heidi's teenage daughter, Alisa, heard G.H. complaining to Daniel that he was hungry. In response, Daniel picked up G.H. and threw him into the pool, crying and screaming, while Daniel continued to dunk him. Daniel held the boy under the water while he struggled to reach the surface and gasped for breath. Alisa knew G.H. could not swim. She grabbed the child and chastised Daniel, who responded, 'Don't tell me what to do. He is my child, not yours.' Another time, Heidi's son Brice also saw Daniel dunking G.H.

"On July 23, 2010, Heidi noticed G.H. had a large bruise around his ear and on the side of his head. Brittany claimed he had slipped in the bathtub. G.H. was scared of the water until Heidi bathed him together with her daughter of the same age. Heidi photographed bruises on G.H.'s legs and back but she did not contact the police.

"On July 28, 2010, Heidi found blood while changing N.S.'s diaper. There was bruising in the shape of handprints on the baby's torso. Keith testified he noticed an additional injury on G.H.'s torso in the shape of a boot print, similar to the military boots issued at Fort Irwin. Keith's command unit instructed him to bring both children to the hospital. Heidi observed G.H. had different bruising from what she had seen the week before. Heidi photographed the fresh bruises with her cell phone. [¶] . . . [¶]

"The children were eventually transferred to Loma Linda University Children's Hospital and treated by Dr. Amy Young. Both children were undersized for

their ages. G.H.'s height was average but his weight was in the lowest fifth percentile for his age. During six days in the hospital, G.H. gained two pounds and six ounces, much greater than the normal gain of an ounce a day for a child his age. N.S., who was eight weeks old, was in the lowest 10th percentile of weight for her age. She had only gained about 19 grams a day since her birth. A newborn normally gains about 30 grams per day. Her head circumference was in the fifth percentile.

"Dr. Young noted that G.H. had over 40 different injuries to his body. G.H. had a torn frenulum—the flap of skin connecting the lip to the gum inside the mouth— which would cause a large amount of bleeding. A torn frenulum could be caused, either accidentally or from abuse, by a blunt impact to the mouth, something forcibly shoved into the mouth, or a slap across the face. G.H. also had bruising to his right ear and the right side of his head, which was not caused by a toddler injuring himself accidentally. When a toddler falls down, he usually falls on the chin, nose, forehead, shins, or other anatomical protuberances. G.H.'s injuries were multiplanar, meaning the injury could be caused by a hand striking the face or by an object that can mold to the face. G.H. also had abrasions beneath his nose and on his chin, and an additional bruise on his upper lip, consistent with being hit in the face. Dr. Young would have expected a reasonable caregiver to have sought medical attention for the visible injuries.

"G.H. had more injuries to his genitals, bruising above his penis, on the tip of his penis, and on his inner groin area, and abrasions to his scrotum. This was unusual because G.H.'s diaper would have protected these areas of the body. The injuries could have been caused by rough diaper changing, or by being pinched, scratched or punched. Finally, G.H. had bruising to his right forearm, right thigh, upper thigh, outer portion of his knee, hand, back, and abdomen. His blood panel revealed a high level of liver enzymes, indicating liver damage and abdominal trauma as a result of blunt impact.

"N.S.'s body bore about 20 bruises located on her left neck, upper left arm,

5

left abdomen, back, chest, right arm, left scalp, behind her left ear, and right leg. There were also some abrasions beneath her left ear. The head and ear injuries could have been caused by being hit on the side of the head. N.S.'s blood panel also revealed a high level of liver enzymes, indicating liver damage.

"N.S.'s wrists appeared to be slightly fractured, caused by yanking on the baby's arms. The fracture to the distal radius, a wrist bone, was a significant injury.

"Both children's bruises were readily visible and were not typically caused except by physical abuse. Dr. Young's opinion was that the children were victims of physical abuse. [¶] . . . [¶]

"A deputy sheriff, Robin Real, assigned to the Crimes Against Children Unit, interviewed Daniel on August 12, 2010, and asked him to explain photographs of the children's injuries. Daniel admitted that he had disciplined G.H. 'too hard' and had 'slapped [G.H.] upside the head,' causing the large bruise to the child's head and ear. Daniel said G.H. was afraid of him, and Daniel admitted hitting G.H. in the abdomen and the groin in frustration. Daniel also admitted N.S.'s wrist injuries may have occurred when Daniel grabbed the baby's hands and tried to stand her up, although she was less than two months old. [¶] . . . [¶]

"A fellow soldier testified that his son played with G.H. and that, when he babysat G.H. and N.S. a few times, he never saw any injuries on the children. The witness said Daniel never acted improperly with G.H., and G.H. had been playing in a bounce house before being taken to the hospital. On cross-examination, the witness admitted he had not mentioned the bounce house in previous testimony.

"The prosecution presented rebuttal evidence that, in the earlier trial, Daniel testified that G.H. had fallen out of the bathtub and hit the side of his head and ear on the toilet, leaving a mark on his ear. In his statement to police, Daniel had said it was him, and not Brittany, who fractured N.S.'s wrists."

6

According to the Agency's detention report: "On August 11, 2010, the San Bernardino County Sheriff's department administered a polygraph test to [Father] and he failed the polygraph test. After failing the polygraph test, he admitted he grabbed [G.H.] by the arms hard and puts him in the corner for time outs. [Father] admitted to hitting [G.H.] on his legs and back as punishment. [Father] reported he gets frustrated with [G.H.], and as a result, [Father] will hit him in the diaper. [Father] reported this is how [G.H.] received the bruises to his penis and scrotum. [Father] denied he pinched [G.H.]'s penis. [Father] admitted he has hit [G.H.] on the abdomen on several different occasions. [Father] disclosed to causing the bruises to [G.H.]'s stomach area. [Father] admitted to hitting [G.H.] on the side of his head. [Father] reported that he caused the injury to [G.H.]'s ear and head. [Father] reported he lifted [N.S.] off the floor by her hands and that he holds her up to stand. [Father] admitted he probably twisted [N.S.]'s wrists, which probably caused the broken wrists. [Father] denied he did this out of frustration. [Father] reported he swaddles [N.S.] in a blanket very tight, and he feels her injuries occurred from being swaddled too tight. [Father] admitted to picking up both, [G.H.] and [N.S.], and squeezing them in his hands between his fingers and thumbs. [Father] denied he hurt [N.S]. During the interview with Detective Real, [Father] began to cry because he said [G.H.] was afraid of him. [Father] reported he only tried to make [G.H.] tougher, but he only made [G.H.] cower in fear."

In 2011, Father's paternal rights were terminated as to N.S. The juvenile dependency matter as to G.H. came within the jurisdiction of the state of Ohio. In 2012 and 2014, Father's paternal rights were terminated as to two additional children that were in the home (K.S. and D.S.). During the proceedings, it was reported that Father and Brittany "actively engaged in domestic violence with both parents hitting each other at various times." Brittany reported that Father "had once choked her until she was unconscious and that while unconscious [Father] punched her in the face." Father later

reported he has another child, H.S., with whom parental rights have not been terminated; however, he has not had any visitations.

In 2020, after serving seven years, four months (88 months) in prison, Father was released from prison. In February 2023, Father was released from parole.

*The Agency's Investigation*

On September 6, 2023, an Agency social worker conducted an unannounced visit at Father's home in Orange County (the record does not disclose precisely what prompted the Agency's investigation). Living at the home were Father, Mother, Owen (15 days old), and two children of Mother by different fathers, A.S (11 years old) and E.M. (8 years old).

The social worker interviewed Mother who said she and Father had been living together since October 2022 and were married in March 2023. Mother said Father was not violent with her or the children. Mother said she was currently on disability leave and had no history of alcohol or drug abuse. Mother said her children were medically insured and had no history of physical, mental, or developmental concerns. Mother said she does not physically discipline the children.

Mother told the social worker she was aware Father was incarcerated for eight years for child endangerment. Mother said Father shared with her the abuse the children involved had endured. Mother said Father told her that he took the blame to keep Brittany from being incarcerated. Mother had received an anonymous e-mail warning of Father's abuse history and she believed it to be from Brittany.

Both of the older children (A.S. and E.M.) were interviewed separately at their school. Both children appeared clean, well-groomed, calm, and cooperative. Both children denied being victims of physical or emotional abuse. Both children said they felt safe in the home and safe with Father.

8

Father told the social worker he was discharged from the U.S. Army in 2013 with a disability and was receiving full benefits. Father said he is currently unemployed but was attending college to become a nurse. Father said he was diagnosed with posttraumatic stress disorder (PTSD) and attends therapy through a Veteran's Affairs therapist. Father believed Brittany called the Agency to report him as an act of revenge. Father denied any history of domestic violence.

Father told the Agency, "in July 2010 he received a call from his sergeant requesting he return to the military base as an emergency had occurred. [Father] explained that upon his return to the military base he was informed that his children had been severely abused and were taken to the hospital by the babysitters [Heidi R. and Keith R.] [Father] explained that he and his ex-wife, Brittany, were questioned regarding the bruises, marks, and broken wrists that the children, [N.S. and G.H.], had endured. [Father] stated he volunteered to take a polygraph test."[3]

Father also told the Agency that, "he and his ex-wife denied hurting the children and he believed it was the babysitters who hurt the children. [Father] stated he continued to deny the allegations and stated that he was questioned by detectives for hours. [Father] stated that the detectives told him that he or his ex-wife were lying, and they were going to either arrest the ex-wife or him. [Father] stated that the detective asked him, 'Want us to take your wife (ex-wife) or you'? [Father] stated he was young and naïve and could not believe that his ex-wife would ever hurt his children, so he decided to respond to the detectives by saying 'take me'. [Father] stated that the detectives stated he needed to confess how he hurt the children and [Father] eventually said, it was him that hurt the children and the detectives continued to ask him how. [Father] stated he told the detective he might have grabbed [N.S.'s] wrists too hard

_____

[3] The San Bernardino Sheriff's Department asked Father whether he caused the injuries to the two children and he failed the polygraph test.

9

causing them to break. [Father] stated he took the blame as he could not allow for his ex-wife to be arrested. [Father] stated he believed he was protecting [Brittany] as he believed at that time that it was the babysitters who abused the children . . . . [Father] stated that before taking the blame for hurting the children he told the detectives multiple times that he did not hurt his children and strongly believed it was the babysitters."

Father said that "he never hurt his children, and many factors ultimately led to his arrest. [Father] explained the following factors that led to his arrest were the following: number one, he did not believe his ex-wife would hurt the children and thought he was protecting her; number two, he was young and naïve; number three, he was pressured into confessing to the detectives; number four, he could not afford an attorney; number five, his public defender called him 'stupid' for not taking the plea deal that was offered to him, ultimately not representing him adequately; number six, [Father] believed the District Attorney (DA) might have been involved in the [jurors'] decision as [Father] saw the DA in an office talking to the jurors."

*Court Proceedings*

On September 29, 2023, the Agency filed a request for a protective custody warrant. The court denied the request. That same day, the Agency filed a noncustody application for a petition.

On October 3, 2023, the Agency filed a juvenile dependency petition alleging Owen came within the jurisdiction of the juvenile court under three subdivisions of section 300. (See §§ 300, subd. (a) [substantial risk of serious physical harm], 300, subd. (b)(1) [failure to protect], 300, subd. (j) [abuse of sibling].)

The Agency also filed a detention report alleging Owen "will be at serious risk of physical abuse by [Father] if he continues to be in his care. Although, [Father] reported he has turned his life around, [Father] has not participated in any type of services

10

to address the concerns regarding the physical abuse charges against the child's paternal half-siblings. [Father] was not being forthcoming and later indicated he was wrongfully convicted . . . . [Father] claimed he did not hurt his children and strongly believed it was the babysitters who abused the children." The Agency stated Father's "statements show he has not taken responsibility for his child abuse charges even though he has completed his sentences." The Agency recommended that "the family would benefit from continued Juvenile Court intervention while the child remains in the care of [Mother] with the supervision and intervention of the Court."

On October 4, 2023, the court found a prima facie case and ordered Owen detained from Father and released to Mother with several protective orders (e.g., no unauthorized contact with Father).

On November 14, 2023, the Agency filed a jurisdiction/disposition report. The Agency "recommended [Father] remain out of the family home until [Father] is participating in services to address his role in the abuse of the half-siblings and it can be determined [Father] has taken measures to ensure said abuse will not happen again."

On January 12, 2024, the Agency filed an addendum report in which it continued to recommend that the court sustain the petition, declare dependency, provided family maintenance services to Mother with enhanced services to Father, and schedule a six-month review.

On January 18, 2024, the court presided over a jurisdiction/disposition hearing. At the conclusion of the hearing, the court declared Owen a ward of the court and adopted the Agency's recommendations (the hearing will be covered in greater detail in the discussion section of this opinion).

## II

## DISCUSSION

Father filed an appeal arguing the court's jurisdictional findings were not supported by substantial evidence; county counsel concedes the court's dispositional orders were not supported by findings of fact.

We review challenges to the sufficiency of the evidence underlying jurisdiction and disposition findings for substantial evidence.  (*In re Ma.V.* (2021) 64 Cal.App.5th 11, 22 (*Ma. V.*).)  The appellate court determines whether there is substantial evidence, contradicted or uncontradicted, to support those findings and, in so doing, "draws all reasonable inferences from the evidence to support the findings and orders."  (*In re Heather A.*, *supra*, 52 Cal.App.4th at p. 193.)  The appellate court reviews the record in the light most favorable to the juvenile court's findings and does not reweigh the evidence or the court's credibility determinations.  (*Ibid.*)

If supported by substantial evidence, the judgment or finding must be upheld, even though substantial evidence may also exist that would support a contrary judgment and the dependency court might have reached a different conclusion had it determined the facts and weighed credibility differently.  (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)  Thus, the pertinent inquiry when a finding is challenged on sufficiency of the evidence grounds is whether substantial evidence supports the finding, not whether a contrary finding might have been made.  (*Ibid.*)

In the remainder of this discussion we shall:  A) state relevant principles of law; B) summarize the arguments made at the jurisdiction/disposition hearing; and C) analyze the facts as applied the relevant laws.

## A.  *Relevant Principles of Law*

"A child who comes within any of the following descriptions is within the

jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶] The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." (§ 300, subd. (a).) Another ground for jurisdiction is that: "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . : [¶] (A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child." (§ 300, subd. (b)(1)(A).) A further ground is that: "The child's sibling has been abused or neglected . . . , and there is a substantial risk that the child will be abused or neglected . . . ." (§ 300, subd. (j).)

"'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

"Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. [Citations.] The court may consider past events in deciding whether a child presently needs the court's protection. [Citations.] A parent's "'[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.'" (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601–602.)

"To establish a defined risk of harm at the time of the hearing, there 'must be some reason beyond mere speculation to believe the alleged conduct will recur.'" (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1146; see *Ma.V.*, *supra*, 64 Cal.App.5th at p. 23

13

[there must be some reason to believe acts creating a risk of harm to the child may continue in the future]; *In re J.N.* (2021) 62 Cal.App.5th 767, 775 [there must be "a nexus between the parent's past conduct and the current risk of harm"].)

A parent is collaterally estopped to relitigate the abuse of a minor's sibling where the issue has been decided in previous dependency proceeding to which the parent was a party. (*In re Joshua J.* (1995) 39 Cal.App.4th 984, 992.) "Proof that either parent, the guardian, or other person who has the care or custody of a minor who is the subject of a petition filed under Section 300 has physically abused, neglected, or cruelly treated another minor shall be admissible in evidence." (§ 355.1, subd. (b).)

In making a jurisdiction ruling the juvenile "court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and *any other factors* the court considers probative in determining whether there is a substantial risk to the child." (§ 300, subd. (j), italics added.)[4]

"We recognize that *denial is a factor* often relevant to determining whether persons are likely to modify their behavior in the future without court supervision. This most commonly is significant in cases where a person having been adjudicated to have perpetrated sexual or physical abuse on a minor in his custody, vigorously denies the abuse and, because of this denial, is likely to be resistant to therapy or treatment necessary to effect behavioral changes to insure the minor will not be a risk if placed in his custody." (*In re Esmeralda B*. (1992) 11 Cal.App.4th 1036, 1044.)

"A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless

---

[4] Under section 300, subdivision (j), the term "sibling" includes a child's half sibling or stepsibling. (See, e.g., *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 968-969.)

14

the juvenile court finds clear and convincing evidence of any of the following . . .: [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) "The court shall consider, as a reasonable means to protect the minor, each of the following: [¶] (A) The option of removing an offending parent . . . from the home. [¶] (B) Allowing a nonoffending parent . . . to retain physical custody as long as that parent . . . presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm." (§ 361, subd. (c)(1)(A)&(B).)

## B. *The Jurisdiction/Disposition Hearing*

At the jurisdiction/disposition hearing, the Agency called no witnesses and submitted into evidence its previously filed reports without objection. County counsel summarized Father's prior acts of child abuse. Counsel argued that "the Agency has concerns in this case that [Father] is still not taking responsibility for what happened with the other children. And by [Father] not doing that, the child Owen is at risk of serious physical harm." As far as Mother, counsel said that "she is aware of [Father's] history but seems to downplay it as not serious and has said [Father] has told her it was his ex-wife [Brittany], essentially still not taking the blame for it."

County counsel noted Mother's two older children were not subjects of the instant petition: "However, the Agency, aside from in the detention report, has been unable to interview them to check and see if anything is going on in the home. When they do make appointments . . . , the children are not in the home for them to check and just see if there's any violence or anything going on in the home."

Owen's appointed counsel argued the petition "can and should be sustained

in whole." Counsel argued that Owen was of "similar age and vulnerability as" his stepsiblings who had been victims of Father's child abuse.

Father's counsel argued Father "is now gainfully employed. He just informed me that he recently got promoted. Other than the fact that there's this open case and that he can't go home, overall he's really changed his life around."

The court asked, "If your client is still proclaiming his factual innocence, how then can he have an appreciation for or how then can he acknowledge any wrongdoing? [¶] He's not acknowledging any wrongdoing; and there were clearly some pretty egregious circumstances. So how then could he have changed or improved if he didn't even acknowledge he did anything wrong?" Father's counsel responded: "The social worker in the report says: 'Father reported he has taken responsibility for what happened in the past as he spent eight years in prison.'"

The court interjected: "Well, wait, wait. That's not taking responsibility. If you're convicted by jury and you are involuntarily committed to prison, that's not taking responsibility; he had no choice in that part. It's not like he signed up to go -- 'Okay, I'll go to prison.' He was ordered to go.

"So I'm wondering -- I mean perhaps there's no pat answer, but I'm just trying to reconcile the two things that are talked about. I'm looking at a pretty serious case, yes, 10 years ago and a person that says, 'Hey, I'm innocent. I'm innocent.' And at the same time, you're arguing that he's now better. [¶] Better from what?

"He never said he was . . . guilty of whatever it was. You know, that's kind of the issue I'm having. It's not as though he . . . acknowledged and admitted, 'Yes, I did that. It was egregious.' -- I was at such-and-such a place in my mind; I was in such-and-such-and-such a thing. And now I've done A, B and C, and, therefore -- you know -- see me now, so to speak. You know, 'See what I'm doing now; see the person I am now.' [¶] He's not claiming that he's . . . any different person from when he was then. He's

16

claiming, 'I was innocent then; I'm innocent now.'"

The court announced that it would be sustaining the petition and declaring dependency. The court then heard counsel's arguments as far as disposition. County counsel argued for the visitation by Father "to remain supervised as it currently is, with mother not to supervise." Mother's counsel argued that "Owen would best be served by having [Father] in the home under a family maintenance plan." Father's counsel largely joined in Mother's request. Owen's counsel generally asked that the court adopt the recommendation of the Agency.

The court found "by clear and convincing evidence that Section 361 (c)(1) applies and to vest custody with Father would be detrimental to the child, and to vest custody with mother is required to serve the child's best interests. The welfare of the child requires that custody be taken from [Father] and remain vested with Mother." The court did not state the facts supporting its dispositional orders.

*C. Analysis and Application*

Father is challenging the court's jurisdiction ruling and dispositional orders. We will analyze these challenges separately.

*1. The Court's Jurisdiction Ruling*

"'A father does not have the privilege of inflicting brutal treatment upon each of his children in succession before they may individually obtain protection of the state.'" (*In re Dorothy I.* (1984) 162 Cal.App.3d 1154, 1158.) In *Dorothy I.*, a three-year-old child was declared a dependent child based on evidence her father had sexually molested her half sister over 15 years earlier. (*Id*. at pp. 1156–1157.) The Court of Appeal affirmed. The court reasoned that the father's prior "specific acts of misconduct" were appropriately "being used in helping the [juvenile] court determine his

17

predisposition toward future sexual abuse with the minor Dorothy. This type of character evidence is essential, when available, to aid the court in dependency actions, which are concerned with the future well-being of a minor." (*Id*. at p. 1159.)

Here, Father had a history of anger issues involving two of Owen's half siblings, which resulted in Father inflicting serious injuries on both children over a sustained period of time. (See § 300, subd. (j).) Father's bursts of anger against two young children were witnessed by multiple people. Although Father's acts of child abuse had occurred about 13 years earlier (in 2010), Father was either in prison or in constructive custody (parole) for most of that intervening period until February 2023.

What was of particular concern to the Agency, and ultimately to the court, was that Father was not acknowledging—and was actually denying—having inflicted serious injuries on Owens' half siblings. And largely because Father was not currently taking responsibility for his actions, the court ultimately concluded Owen was at risk of serious physical harm. As other courts have held, we find Father's past behavior and current denials are relevant factors that the court could consider "in determining whether there is a substantial risk to the child." (§ 300, subd. (j); *In re Esmeralda B*., *supra*, 11 Cal.App.4th at p. 1044 ["*denial is a factor* often relevant to determining whether persons are likely to modify their behavior in the future without court supervision"].)

In sum, we conclude that based on our review of the record, there was sufficient evidence to support the court's conclusion that Owen was at serious risk of physical harm. Although this appears to have been a close ruling, and perhaps a different court may have made a contrary ruling, we conclude there was substantial evidence to support the court's decision. (See *In re Dakota H*., *supra*, 132 Cal.App.4th at p. 228 [the pertinent inquiry when a finding is challenged on sufficiency of the evidence grounds is whether substantial evidence supports the finding, not whether a contrary finding might have been made].) Thus, we affirm the court's jurisdiction ruling.

Father cites various cases such as *Ma. V.*, *supra*, 64 Cal.App.5th 11, for the proposition: "The Agency's reliance on facts from a fourteen year old case does not establish a substantial risk of serious physical harm. Moreover, the record is silent as to any nexus between the past conduct and a current risk of harm." We disagree.

In *Ma. V.*, a juvenile court sustained a dependency petition, in part, based on the mother's having exposed her children to incidents of domestic violence through engaging in abusive relationships, and having mental health problems that were left untreated. (*Ma.V.*, *supra*, 64 Cal.App.5th at p. 22.) However, the Court of Appeal found there was insufficient evidence to sustain the jurisdiction order because there had been no recent incidents of domestic violence: "Because of the pandemic, Mother had an unusually long amount of time before the jurisdiction hearing. In that time, Mother resolved the key [mental health] concerns warranting jurisdiction." (*Id*. at p. 23.)

What distinguishes the facts in this case from *Ma.V.*, and other cases cited by Father, and what provides the nexus between his past conduct and the current risk of harm to Owen, is Father's present day denial of his prior acts of severe child abuse against Owen's two half siblings. Again, we find substantial evidence supports the court's ruling. (See *In re I.J.*, *supra*, 56 Cal.4th at p. 778 ["the more severe the type of sibling abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect under section 300. If the sibling abuse is relatively minor, the court might reasonably find insubstantial a risk the child will be similarly abused; but as the abuse becomes more serious, it becomes more necessary to protect the child from even a relatively low probability of that abuse"].)

*2. Dispositional Orders*

Generally, "[a] child may not be taken from a parent's physical custody during juvenile dependency proceedings . . . unless clear and convincing evidence

19

supports a ground for removal specified by the Legislature. Removal on any ground not involving parental rejection, abandonment, or institutionalization requires a finding that there are no reasonable means of protecting the child without depriving the parent of custody." (*In re Henry V.* (2004) 119 Cal.App.4th 522, 525.)

Before a juvenile court removes a dependent child from the custody of his or her parents, it must "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal . . . . The court shall state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).)

County counsel states that "the juvenile court did not detail the specific basis as to the lack of reasonable means by which Father could retain custody. A court errs in failing to state facts supporting that conclusion." However, county counsel argues, "Father did not object to any such deficiency below, and the issue could have easily been remedied by a timely objection and/or request for such findings; his complaints should be deemed forfeited before this Court."

County counsel is correct that an appellate court will ordinarily not consider a challenge to a dependency ruling if that challenge pertains to an objection that could have been raised in the juvenile court; however, "application of the forfeiture rule is not automatic." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 (*S.B.*).)

In *S.B.*, *supra*, 32 Cal.4th at page 1293, the Supreme Court determined that the appellate court did not abuse its discretion by entertaining the issue raised by the mother on appeal despite her failure to object below. Indeed, the issue in *S.B.* arose during the permanency planning hearing, which is essentially at the end of the juvenile dependency process, when the interests shift to focus on the permanency and stability of the minors. (See *Id.* at p. 1292.) By contrast, the matter before us is in a much earlier stage, when the parent's interest in reunification is given precedence over the child's need for stability and permanency. (See *In re Marilyn H.* (1993) 5 Cal.4th 295, 298, 310.)

20

The instant matter seems to present a strong case for the exercise of our discretion to excuse Father's forfeiture. Although we have found there was substantial evidence to support the court's jurisdiction ruling, there was no record of Father having inflicted any harm as to Owen, and there is no indication in the record that the court considered any options short of removing Owen from Father's custody. (See, e.g., *In re Henry V.*, *supra*, 119 Cal.App.4th at p. 529 ["unannounced visits and public health nursing services [are] potential methods of supervising an in-home placement"].)

Thus, we are reversing the court's dispositional orders with instructions to conduct a new hearing. If the court removes Owen S. from Father's custody, the court shall state the factual basis of its ruling. We are further instructing the court to gather and consider any additional addendum reports submitted by the Agency, and to consider any orders that may be appropriate given the current circumstances.

III

DISPOSITION

The court's jurisdiction ruling is affirmed. The court's dispositional orders are reversed. On remand, the court is instructed to conduct a new disposition hearing.

MOORE, ACTING P. J.

WE CONCUR:

SANCHEZ, J.

DELANEY, J.

21